UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

CLIFFORD SLIGHTOM,

        Plaintiff,

    v.

NATIONAL MAINTENANCE
& REPAIR, INC.,

        Defendant.

Case No. 09-cv-683-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant National Maintenance & Repair, Inc.'s (hereinafter "National Maintenance") Motion for Summary Judgment (Doc. 25) and Memorandum (Doc. 26) in support thereof.  Plaintiff Clifford Slightom (hereinafter "Slightom") filed a Response (Doc. 30) thereto, to which National Maintenance filed a Reply (Doc. 31).

For the following reasons, the Court **GRANTS** the instant motion.

## BACKGROUND

I.    **Facts**

In analyzing a motion for summary judgment, the reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The Court, construing the evidence and all reasonable inferences in the light most favorable to Slightom, finds as follows:

A.    **Slightom's Employment with National Maintenance**

Slightom worked for National Maintenance and began his employment with the company on March 22, 1991.  He was a member of Local Lodge 482 of the International Brotherhood of

Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO (hereinafter "the Union").

In 1994, doctors diagnosed Slightom with carpal tunnel syndrome resulting from his work with National Maintenance.  On December 12 of that year, National Maintenance filed the appropriate report with the United States Department of Labor, stating that the injury came under the Longshore and Harbor Workers' Compensation Act.  National Maintenance eventually assigned Slightom to work in its tool room, where he was responsible for the distribution and repair of tools and equipment.

On March 29, 1995, Slightom took a leave of absence so that he could obtain treatment for his injury.   During this time, Slightom underwent surgery for carpal tunnel syndrome on his right hand.  He also underwent surgery on his left hand for multiple crush syndrom, which occurs when one's nerves, veins, and arteries become impinged at the joints.  Slightom ultimately went under the knife nine times.

Slightom's physician eventually concluded he had reached maximum medical improvement.   Slightom returned to work on June 11, 1997, with the following permanent restrictions: no lifting over 30 pounds; no exposure to cold weather for more than 15 to 20 minutes; no overhead work; no use of vibratory tools; and no repetitive motion.  At the request of National Maintenance, Slightom underwent a functional capacity examination in 2006.  The examining physician determined that Slightom's previous restrictions should remain in place.

Since Slightom's surgeries, two of his direct supervisors called him crippled, sick, lame, lazy, useless, worthless, and handicapped on multiple yet unspecified occasions.  Despite the obvious obstacles and opinions of his two supervisors, Slightom has always believed he can

perform numerous jobs that fit within these restrictions.[1]

### B.    National Maintenance's Absenteeism Policy

Like most employers, National Maintenance has an absenteeism policy that governs its

workers.  The policy at issue was effective from February 1, 2006, to January 31, 2009.  The

policy was negotiated by National Maintenance and the Union and was located in an employee

handbook and incorporated into a collective bargaining agreement.[2]  It allowed employees of

National Maintenance to take six personal days per year.  If an employee took more than six

personal days, National Maintenance followed a progressive discipline scheme, whereby an

employee taking twelve personal days would be fired.

If an absence was excused, however, it did not count as a personal day.  An absence

could be excused if one submitted a doctor's slip on his first day back to work.  This slip had to

contain the employee's name, the earliest date he was seen by a doctor, the date he could return

to work, the doctor's signature, and the date of the doctor's signature.  It was the responsibility

---

[1]Slightom experienced and personally noted several other limitations after his surgeries.  In 2001, these limitations included an inability to carry more than five to ten pounds for a few hundred feet, an inability to raise his left arm all the way over his head, an inability to walk more than a mile, and restrictions in activities such as mowing the lawn, hunting, canoeing, and playing ball.  (Doc. 30-9, p. 3).  Nevertheless, these limitations largely subsided, and Slightom now agrees that the physicians' recommended restrictions represent the extent of his limitations.  (*See* Doc. 26-1, p. 44); (*see also* Doc. 30, p. 4) ("[Slightom] *could* only carry 5 to 10 lbs. for 200 feet before his arm would go numb and his aching would continue.  He *had* pain in his left shoulder if he turned wrong and he *was* unable to raise his arm over his head.") (emphasis added).

[2]At the final pretrial conference held on October 8, 2010, Slightom argued that portions of the handbook, including the specific parameters of its absenteeism policy, had not been negotiated with the Union but unilaterally promulgated by National Maintenance.  The collective bargaining agreement, however, effectively rebuffs this assertion.  (*See* Doc. 26-12, p. 39) ("[National Maintenance and the Union] have negotiated, and agreed upon, an absentee control policy and it is incorporated herein by reference.  See attendance policy [in the] attached [handbook].").

of the employee to ensure that the information in his doctor's slip is correct.  Of course, if one did not comport with the timing or general requirements governing doctor's slips, he was charged a personal day.

National Maintenance has a supplemental policy that gives its employees one chance per calendar year to correct an insufficient doctor's slip.  In essence, if one submits an insufficient slip, he must submit a slip that meets all of the aforesaid requirements before the start of his next shift.  If an employee worked the midnight shift, like Slightom, he had until the *end* of his *next* shift to cure and submit the slip.  This policy was established in order to create parameters regarding the acceptance and correction of doctor's slips.  National Maintenance has never accepted a doctor's slip that failed to comply with the foregoing policies, even if the slip was only a few hours late.  Likewise, National Maintenance has never excused an absence on the basis of a late doctor's slip.

### C.    Slightom's Termination

From 1997 to 2007, Slightom took at least nine personal days every year.  In 2008, Slightom had amassed eleven personal days by mid-November.  Around that time, he had to miss work because of an upper respiratory infection.

Following his first midnight shift back on November 18, Slightom submitted a doctor's slip to Judy Ballard (hereinafter "Ballard").  Per National Maintenance's policy, the slip contained Slightom's name, the dates he was excused (November 14, 15, and 17), the date he could return to work (November 18), and the doctor's signature.  Although she had no way to tell whether Slightom had actually been absent on the dates listed on the slip, Ballard accepted it because it contained all of the information under National Maintenance's policy.  That afternoon, Elaine Schreier (hereinafter Schreier), the human resources assistant, reviewed the personal days

4

report and noticed that Slightom's slip did not cover November 13, a day he had missed work yet not been excused.  Of course, if National Maintenance deemed Slightom's absence on November 13 as unexcused, he would be terminated.

Slightom, however, still had not used his "one time fix" in 2008.  Therefore, he had until the end of his next shift, which started at 11:00 p.m. on November 18 and went until 7:30 a.m. on November 19, to cure and tender a doctor's note with the correct dates and other requisite information.  Although not required by company policy, Schreier called Slightom's home at approximately 2:00 p.m. or 2:30 p.m. on November 18 to inform him of the insufficient doctor's slip, its potential ramifications, and the available "one time fix."  When no one answered the call, she left a message explaining the purpose of her call.

Noone at National Maintenance heard from Slightom with respect to the aforementioned until near the end of his shift (between 7:00 and 7:30 a.m.) on November 19.  Around that time, Slightom spoke with Ballard and Schreier separately.  Slightom explained that his doctor's office had made a clerical mistake and that his wife did not receive Schreier's message until the early morning of November 19.  Upon inquiry, Schreier told Slightom that a corrected doctor's slip could be submitted, but she did not know if National Maintenance would accept an untimely slip.

Slightom contacted his doctor's office when it opened (approximately 9:00 a.m.) on November 19 and explained the situation.  The doctor's office faxed a corrected slip to National Maintenance at 9:51 a.m. that morning.  Nevertheless, after human resources double checked Slightom's attendance record for 2008, the vice president of human resources decided to terminate Slightom.  The vice president did not discuss this decision with either of Slightom's direct supervisors who had previously insulted him, and they played no role in his termination.

5

In response to Slightom's termination, the Union filed a grievance on his behalf; however, the Union did not further pursue this grievance after National Maintenance denied it as untimely.  Slightom took legal action shortly thereafter.

## II.      Relevant Procedural Posture

On March 19, 2009, Slightom filed a charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission (hereinafter "EEOC"), alleging discrimination on the basis of his age and disability (multiple crush syndrome).  Unsatisfied with the disposition of his charge of discrimination, Slightom filed suit against National Maintenance in Madison County, Illinois, on May 12, 2009.

While still in state court, Slightom filed an Amended Complaint (Doc. 5-5), alleging retaliatory discharge (Count I), punitive damages (Count II), and violation of the Americans with Disabilities Act (Count III).  Slightom's amended complaint notably remains the operative complaint of this case.  National Maintenance removed the matter to this Court on August 31, 2009, claiming that Count III fell under this Court's federal question jurisdiction.  Finally, on May 21, 2010, National Maintenance moved for summary judgment.

## ANALYSIS

## I.      Summary Judgment Generally

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must

present specific facts to show that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), or by "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Anderson,* 477 U.S. at 252.

## II.     Slightom Failed to Exhaust His Administrative Remedies on the Retaliation Claim

Slightom's first claim is for retaliation.[3]  More precisely, Slightom alleges that National Management retaliated against him and fired him because of his 1994 injury claim under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq*. (hereinafter "Longshore Act").  (*See* Doc. 5-5, ¶¶ 4-5, 7).

The Longshore Act provides, in pertinent part, as follows: "It shall be unlawful for any employer or his duly authorized agent to discharge or in any other manner discriminate against an employee as to his employment because such employee has claimed . . . compensation from such employer, or because he has testified . . . in a proceeding under this chapter."  33 U.S.C. § 948a (2006); *see* 20 C.F.R. § 702.271(a)(1) (2010).  Section 948a and related regulations describe the administrative process one must follow when filing a retaliation claim that involves the Longshore Act.  Specifically, one must submit a complaint with the district director of the

---

[3]Analysis of Slightom's claim for retaliatory discharge (Count I) necessarily includes analysis of his claim for punitive damages (Count II).  Punitive damages merely represent a form of relief that may be available if the retaliatory discharge claim is sustained.

compensation district that heard his Longshore Act claim.  § 702.271(b).  The district director

then conducts an investigation of the complaint, holds an informal conference if necessary, and,

if it is determined that discrimination occurred, decides the extent of restitution and whether the

complainant can be restored to his employment.  § 702.271(b)-(d); § 702.272.

     A specific appeals process governs review of the district director's findings.  *See* 33

U.S.C. § 921(e) (2006) ("Proceedings for . . . rejecting a claim or making an award [under the

Longshore Act], shall not be instituted otherwise than as provided in this section and section 918

of this title.").  This appellate scheme eventually allows one to bypass the federal district courts

and obtain review by the appropriate United States court of appeals.  § 921(c).  When one fails to

follow these necessary administrative and appellate channels, he has not exhausted his

administrative remedies.  *Maxon Marine, Inc. v. Dir., Office of Workers' Comp. Programs*, 39

F.3d 144, 147 (7th Cir. 1994) ("The rule that if a special review procedure is prescribed a party

must follow it — a rule of federal common law but also an express provision of the Longshore

[Act], 33 U.S.C. § 921(e) — both instantiates the general principle of exhaustion of

administrative remedies and designates the appropriate reviewing court.") (finding that employer

did not exhaust its administrative remedies and sought review in the wrong court).

     Here, like the employer in *Maxon Marine*, Slightom has clearly failed to exhaust his

administrative remedies under the Longshore Act.  There is no dispute that, while Slightom filed

his original worker's compensation claim under the Longshore Act, he did not bring his

retaliation claim before any district director.  And, even if Slightom had followed the proper

administrative channels, this case would be subject to review by the Seventh Circuit Court of

Appeals, not this Court.

In explaining why he did not follow the administrative process promulgated by the Longshore Act, Slightom touts *Spearman v. Exxon Coal USA, Inc.*, 16 F.3d 722 (7th Cir. 1994) *Spearman*, however, is inapposite.  In *Spearman*, the plaintiff argued that "including time he missed because of injury produced a discharge in retaliation for the exercise of his rights under the workers' compensation laws of Illinois."  *Id*. at 723.  Unlike *Spearman*, the alleged retaliation against Slightom relates to a compensation claim he filed nearly 15 years before his termination.  Moreover, the ultimate issue in *Spearman* was whether a retaliatory discharge claim "arose under" Illinois' workers' compensation laws for purposes of removal pursuant to 28 U.S.C. § 1445(c).  *Spearman*, 16 F.3d at 723.  Slightom has never disputed National Maintenance's removal of this matter.  More importantly, this case involves a workers' compensation claim filed under federal law, not Illinois law.  It is for similar reasons that Slightom's reliance on *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399 (1988) is also misplaced.  The Longshore Act provides a unique and necessary means of addressing retaliation claims related thereto, and Slightom has not sufficiently argued or demonstrated why he should be exempt from its reach.

In sum, no genuine issue of material fact exists with respect to Slightom's retaliation claim.  As such, it shall be dismissed without prejudice due to Slightom's failure to exhaust his administrative remedies.

## III.   Slightom Is Not Disabled under the ADA

Slightom's only other claim against National Maintenance is for violation of the Americans with Disabilities Act of 1990 (hereinafter "ADA"), 42 U.S.C. § 12101, *et seq.*[4][5]

---

[4]While much of the ADA was amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, § 8, 122 Stat. 3559 (2008), these amendments did not become

Multiple crush syndrome represents the alleged disability.

The ADA provides, in relevant part, as follows: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (2006).  A "qualified individual" is defined as "an individual . . . who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  § 12111(8).

To prove an ADA discrimination claim, a plaintiff must show, *inter alia*, that he was "disabled" as defined under the statute and understood by relevant law.  *Jackson v. City of Chicago*, 414 F.3d 806, 810 n. 2 (7th Cir. 2005) (citing *Silk v. City of Chicago*, 194 F.3d 788, 798 n. 6 (7th Cir. 1999)).  A person is disabled for purposes of the ADA if he:

(a) "[h]as a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(b) has a record of such impairment; or
(c) is regarded as having such an impairment."

*Mattice v. Mem'l Hosp. of S. Bend*, 249 F.3d 682, 684 (7th Cir. 2001);  42 U.S.C. § 12102(1) (2006).   In determining whether plaintiff meets the first pathway (i.e. whether he has an

---

effective until January 1, 2009, or after the alleged discriminatory conduct that formed the bases of Slightom's complaints with the EEOC and this Court.  As such, any change in the law that resulted from these amendments will have no bearing on and will not be discussed in the Court's analysis here.  *See Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 521 n. 1 (7th Cir. 2009); *see also Powers v. USF Holland, Inc.*, Case No. 07-cv-246-JVB, 2010 WL 1994833, at *4 (N.D. Ind. May 13, 2010).

[5]This Court can and will use precedent involving the ADA and Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, interchangeably.  *See, e.g., Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193-94 (2002) (using Rehabilitation Act regulations to interpret the ADA); *see also Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir. 1995) (using ADA case law to interpret the Rehabilitation Act).

impairment that substantially limits at least one major life activity), courts undertake the following three inquiries:

> First, we consider whether [the alleged disability] was a physical impairment. Second, we identify the life activity upon which [the plaintiff] relies . . . and determine whether it constitutes a major life activity under the ADA.  Third, tying the two statutory phrases together, we ask whether the impairment substantially limited the major life activity.

*Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *accord Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923 (7th Cir. 2001).

EEOC  regulations provide a non-exhaustive list of "major life activities," including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  *See* 29 C.F.R. § 1630.2(i) (2010); *Bragdon*, 524 U.S. at 638-39 (1998) ("Rather than enunciating a general principle for determining what is and is not a major life activity, the [ADA] regulations instead provide a representative list . . . .").  Such activities need not have a public or economic character to them; they must simply be "central to the life process itself."  *Bragdon*, 524 U.S. at 638.

"Substantially limited" means that one is unable to perform a major life activity at all or is significantly limited in her ability to perform the activity when compared to an average person in the general population.[6]  29 C.F.R. § 1630.2(j)(1) (2010); *Toyota Motor Mfg., Ky., Inc. v.*

---

[6]Courts should consider the following factors when deciding whether a plaintiff is substantially limited in a major life activity:

> (i) "The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."

29 C.F.R. § 1630.2(j)(2) (2010).

*Williams*, 534 U.S. 184, 195-96 (2002).  While courts "must examine the plaintiff's condition as

it exists after corrective or mitigating measures [are taken] to combat the impairment . . . ,"

*Lawson*, 245 F.3d at 924 (relying upon *Sutton v. United Air Lines*, 527 U.S. 471, 482 (1999)), the

plaintiff is entitled to an individualized assessment of his particular circumstances rather than an

assessment based on how a specific impairment usually affects those who have it.  *Branham v.

Snow*, 392 F.3d 896, 902-03 (7th Cir. 2004).

      With respect to the major life activity of working, substantially limited means

"significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in

various classes as compared to the average person having comparable training, skills and

abilities."  29 C.F.R. § 1630.2(j)(3)(I) (2010); *Mack v. Great Dane Trailers*, 308 F.3d 776, 781-

82 (7th Cir. 2002).  It is important to note that "[t]he inability to perform a single, particular job

does not constitute a substantial limitation in the major life activity of working."  §

1630.2(j)(3)(I).  Here, there is no dispute that Slightom is a "qualified individual" under the

ADA or that he suffers from a physical impairment as contemplated by the first *Bragdon*

inquiry.  Therefore, the question becomes whether Slightom's multiple crush syndrome

substantially limits any of his major life activities.  The Court finds that this question must be

answered in the negative and that no reasonable jury could disagree.

      Slightom does not clearly state the major life activity at issue, although he suggests that it

is working.  (*See* Doc. 30, p. 10) (Slightom "had a disability that severely limited his ability to

work performing manual tasks.").  As aforementioned, to be substantially limited in the major

life activity of working, one must be significantly restricted in his ability to perform a class of

jobs or broad range of jobs in various classes.  Despite this threshold requirement,  Slightom has

not put forth any evidence that the alleged disability significantly impedes his performance of a

class or broad range of jobs.  In fact, during his deposition, Slightom indicated the opposite by testifying that he "probably could" perform a number of other jobs so long as they did not require him to work outdoors during the winter and did not require him to lift more than 30 pounds.  (Doc. 26-1, p. 43).  Slightom's failure to identify a genuine issue of material fact with respect to this requirement is devastating at the summary judgment phase.  "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."  *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (citations and quotation marks omitted).

The Court has considered the other major life activities stated and suggested by the EEOC and does not find them to be substantially limited by Slightom's multiple crush syndrome.  Again, Slightom's alleged disability brought with it the following restrictions: no lifting over 30 pounds; no exposure to cold weather for more than 15 to 20 minutes; no overhead work; no use of vibratory tools; and no repetitive motion.  However, it cannot be said that being unable to lift more than 30 pounds, experience cold weather for more than 15 minutes, or use certain tools seriously affects any activities central to Slightom's life processes.  Put another way, like the employee in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), Slightom has not and cannot argue that the aforementioned restrictions *currently* substantially inhibit his ability to care for himself, walk, eat, perform manual tasks, etc.

As a final matter on the issue of disability, the Court notes that Slightom cannot be "regarded as" disabled under the third pathway of the ADA.  "[I]f the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute."

*Mack v. Great Dane Trailers*, 308 F.3d 776, 782 (7th Cir. 2002).  Here, the Court has already

explained why Slightom's multiple crush syndrome is not substantially limiting.  This, coupled

with the absence of any evidence that National Maintenance believed Slightom to be

substantially limited in a major life activity,[7] dictates that Slightom cannot proceed under the

"regarded as" prong of the ADA.

## IV.   National Maintenance Had a Legitimate, Nondiscriminatory Reason for Terminating Slightom that Was Not Pretext for Discrimination

Assuming *arguendo* that Slightom is disabled for purposes of the ADA, he still cannot

maintain an ADA claim.  When proceeding under the ADA without any direct evidence of

disability discrimination, as is the case here,[8] a plaintiff can indirectly prove his case via the

burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Tyler v.

Ispat Inland, Inc.*, 245 F.3d 969, 972 (7th Cir. 2001).  Under the *McDonnell Douglas* method of

proof, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.

*Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 672 (7th Cir. 2000).

Assuming Slightom could make out a *prima facie* case of discrimination, the burden of

production shifts, and the employer must overcome a rebuttable presumption of discrimination

by articulating a legitimate, nondiscriminatory reason for the employment action.  *Bekker*, 229

F.3d at 672.  If the employer is successful, the burden then shifts back to the plaintiff to prove

---

[7]While two of Slightom's direct supervisors insulted him on multiple occasions, the Court cannot reasonably infer that they seriously believed Slightom to be significantly limited in any major life activities.  Further, it has not been shown why the offhanded remarks of these individuals should be imputed to National Maintenance.

[8]The insults of Slightom's direct supervisors were not of a sufficiently frequent or serious enough nature to constitute a hostile workplace under the ADA, especially considering the fact that Slightom does not remember any of the dates they were said. *See Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999).

that the employer's articulated reason for the employment action was a pretext for discrimination and that the decision was in fact motivated by an unlawful factor. *Id.* It bears noting that, while the burden of production rests with the employer during the second stage of the *McDonnell Douglas* inquiry, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Here, National Maintenance has articulated Slightom's failure to comply with the corporate absenteeism policy as a legitimate, nondiscriminatory reason for his termination. It is undisputed that Slightom submitted the proper time slip after his shift ended on November 19, 2008. In doing so, he violated the express language of National Maintenance's absenteeism policy and its "one time fix" policy. While Slightom argues that the latter policy required National Maintenance to notify an employee about an insufficient doctor's slip, this is simply not supported by the record.

On the other hand, Slightom cannot prove that the aforesaid rationale is a mere pretext for discrimination upon the re-shifting of the burden of production. The only individuals who displayed any animus towards Slightom's alleged disability — his two direct supervisors — played no role in his termination. More importantly, National Maintenance never accepted an insufficient doctor's slip from its employees, and it never excused an absence because of a late slip. This practice demonstrates that National Maintenance's decision to terminate was aligned with its prior understanding and implementation of the absenteeism policy, not any unlawful factors.

Slightom undoubtedly fell victim to an unfortunate circumstance. His doctor's office made a clerical error that understandably went unnoticed. After learning of the mistake,

15

Slightom immediately sought to remedy the situation, which was corrected in a little over two hours.  Indeed, this case contained a great deal of intricate facts that arguably led to a harsh result.  But, at the end of the day, National Maintenance terminated Slightom because he did not comply with the terms of its absenteeism policy and because the company chose to continue its legitimate tradition of refusing to make exceptions to said policy.  Any perceived inequity cannot trump the valid policy that existed among the Union, National Maintenance, and its employees.

In sum, the Court finds no genuine issue of material fact exists regarding Slightom's ADA claim.

<h2 style="text-align:center">CONCLUSION</h2>

For the foregoing reasons, the Court **GRANTS** National Maintenance's Motion for Summary Judgment (Doc. 25), whereby the Court **DISMISSES** Slightom's claims for retaliation (Count I) and punitive damages (Count II) **without prejudice** and **DISMISSES** his claim for violation of the ADA **with prejudice**.  Further, the Court **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED: October 13, 2010**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

16